FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 0 9 2010

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America and the
State of Georgia, ex rel Joseph L. Micca, M.D.

              Plaintiffs,

V.

GGNSC HOLDINGS, LLC, D/B/A GOLDEN
HORIZONS, GOLDEN GATE NATIONAL
SENIOR CARE, LLC, D/B/A GOLDEN LIVING,
GOLDEN GATE ANCILLARY, LLC
D/B/A GOLDEN INNOVATIONS,
BEVERLY ENTERPRISES, INC.,
BEVERLY ENTERPRISES – GARDEN TERRACE,
INC., BEVERLY ENTERPRISES GEORGIA, INC.,
BEVERLY HEALTH AND REHABILITATION
SERVICES, INC., GGNSC ADMINISTRATIVE
SERVICES, LLC, D/B/A GOLDEN VENTURES,
GGNSC CLINICAL SERVICES, LLC, AEGIS
THERAPIES, INC., HOSPICE PREFERRED
CHOICE, INC., GGNSC ATLANTA, LLC D/B/A
GOLDEN LIVINGCENTER – NORTHSIDE, ALL
DEFENDANTS LISTED IN EXHIBIT 1 TO THE
COMPLAINT, JOHN DOES 1-308, AND
JOHN DOES 309-374,

              Defendants.

CIVIL ACTION NO.

1 10·CV-1055



## COMPLAINT

1.

Plaintiff, Joseph L. Micca, M.D. ("Relator"), brings this *qui tam* action, in the name of the United States of America and the State of Georgia, against the defendants in the above styled action to recover monies from defendants that they obtained as payments from the Medicare and Medicaid programs through the knowing submission of false claims and false statements, and have failed to return same. For its causes of action, plaintiff shows the following:

## I.     JURISDICTION AND VENUE

2.

Subject matter jurisdiction is founded on the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") specifically, 31 U.S.C. § 3730(b), which allows a private person to bring suit for violation of the FCA, and pursuant to 28 U.S.C. §§ 1331 and 1345.

3.

Personal jurisdiction is proper in this District pursuant to 31 U.S.C. § 3732(a) because some of the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of in the instant Complaint were performed by the defendants who transact business or reside in this District.

2

4.

Further, venue is properly in this District because the defendants are subject

to personal jurisdiction in this District and because they transact business in this

District.

## II.    RELATOR JOSEPH MICCA, M.D.

5.

Relator is a resident of the State of Georgia and he brings this suit on behalf

of himself and the United States of America pursuant to the False Claims Act, 31

U.S.C. §3730(b), and on behalf of himself and the State of Georgia pursuant to the

Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168, *et seq.*

6.

Relator is a physician who was the Medical Director of Subacute Services at

the nursing facility known as Golden LivingCenter Northside ("GLC Northside")

from September 1998 until he was terminated in November 2009. (A subacute

patient/resident is a patient who requires skilled nursing care, and usually is being

admitted to the nursing facility from a hospital). He also was, and continues to be,

the attending physician for numerous patients who reside or resided at GLC

Northside who are collectively under the care of the Defendants and their

employees or agents.  From early 2005 until October 2006, Relator served as

Medical Director of the hospice care provider AseraCare Atlanta.

7.

As required by the FCA, specifically 31 U.S.C. §3730(a)(2), Relator has

provided to the United States Attorney for the Northern District of Georgia,

simultaneous with the filing of this complaint, a statement of all evidence and

information in his possession related to the Complaint.  Relator has direct, personal

knowledge of the matters alleged herein.

### III.   DEFENDANTS GOLDEN LIVING AND AFFILIATED DEFENDANT ENTITIES

   a.  Golden Living Corporate Defendants

8.

Defendants GGNSC Holdings, LLC, d/b/a Golden Horizons, Golden Gate

National Senior Care, LLC, d/b/a Golden Living, GGNSC Administrative, LLC

d/b/a Golden Ventures, and Golden Gate Ancillary, LLC d/b/a Golden Innovations

exist according to the laws of the State of Delaware and they collectively do

business as Golden Living, maintaining a website for their healthcare services

business located at http://www.goldenliving.com.   Upon information and belief,

the principal offices of the Defendants are located at 1000 Fianna Way, Fort Smith,

4

Arkansas, 72919.  These defendants shall hereinafter be collectively referred to as
"GL Holding Corporations."

9.

GL Holding Corporations, through the business known as Golden Living,
own, operate, or control 15 skilled nursing and assisted living facilities located in
Georgia, which the Golden Living website calls "Golden LivingCenters."  These
facilities and the corresponding corporate entity that operates, owns to controls
these facilities, are listed in the document attached hereto as Exhibit 1.  All the
entities listed in Exhibit 1 are incorporated in the State of Delaware, but are
authorized to do business in the state of Georgia and list their principal place of
business as 1000 Fianna Way, Fort Smith, Arkansas, 72919.  Along with the
defendants listed in paragraph 10 below, these entities and the facilities they own,
operate, or control shall hereinafter be collectively referred to as "Golden
LivingCenters."

10.

GL Holding Corporations, through the business known as Golden Living,
own, operate, or control over 300 skilled nursing and assisted living facilities
located in 21 states, which the Golden Living website calls "Golden
LivingCenters."  A full list of these centers, as listed on the Golden Living website,

5

is attached hereto as Exhibit 2, and the corporate entities related to these centers are named in the instant Complaint as John Doe Corporations 1 through 309. The centers identified in Exhibit 2 shall hereinafter be collectively referred to as "Golden LivingCenters."

11.

Defendant Beverly Enterprises, Inc., exists under the laws of the State of Delaware. Defendants Beverly Enterprises – Garden Terrace, Inc., Beverly Enterprises Georgia, Inc., Beverly Health and Rehabilitation Services, Inc., exist under the laws of California. All Defendants referred to in this paragraph shall hereinafter be collectively referred to as "Beverly Corporations."

12.

In or about March, 2006, Beverly Enterprises, Inc. and its subsidiaries were merged into a subsidiary of Fillmore Capital Partners, LLC, a California-based investment fund, in a transaction which essentially converted Beverly Enterprises from a publicly-held corporation into a privately-held entity. Upon information and belief, Beverly Corporations are involved with the submission of false claims for payment to Medicare and Medicaid programs occurring at Golden LivingCenters, and other facilities, as alleged in the instant Complaint, in the same manner as GL Holding Corporations.

6

13.

Defendants GGNSC Administrative Services, LLC, (hereinafter "GL Administrative") and GGNSC Clinical Services, LLC, (hereinafter "GL Clinical"), exist according to the laws of the State of Delaware and operate in coordination with GL Holding Corporations and/or Beverly Corporations. Like GL Holding Corporations, their principal office address is 1000 Fianna Way, Fort Smith, Arkansas, 72919.

14.

While the exact role of GL Administrative and GL Clinical in the Golden Living corporate structure is unknown, upon information and belief, GL Administrative and GL Clinical are the entities by which GL Holding Corporations manage and set policy for all facilities controlled, operated or owned by GL Holding Corporations nationwide.

15.

Defendant Aegis Therapies, Inc., (hereinafter "Aegis Therapies") exists under the laws of the State of Delaware and its principal office address is 1000 Fianna Way, Fort Smith, Arkansas, 72919. Upon information and belief, Aegis Therapies provides physical and rehabilitative therapy services at all nursing facilities owned or operated by GL Holding Corporations

7

16.

GL Holding Corporations, GL Administrative, GL Clinical, Aegis

Therapies, and Beverly Corporations are hereinafter collectively referred to as

"Golden Living Corporate."

17.

Defendant GGNSC Atlanta, LLC d/b/a/ Golden LivingCenter – Northside

(hereinafter "GLC Northside"), is organized under the laws of the State of

Delaware, with its principal office being located at 1000 Fianna Way, Fort Smith,

Arkansas, 72919. Upon information and belief, GLC Northside owns, controls or

manages, by itself or together with Golden Living Corporate, the facility known as

Golden LivingCenter – Northside. GLC Northside is controlled, owned, or

operated by GL Holding Corporations.

18.

Hospice Preferred Choice, Inc. is organized under the laws of the State of

Delaware, with its principal office being located at 1000 Fianna Way, Fort Smith,

Arkansas, 72919. Upon information and belief, Hospice Preferred Choice, Inc.

does business as AseraCare Hospice Atlanta and/or AseraCare Atlanta, and is

owned or controlled by one or more GL Holding Corporations, which owns,

controls or manages the hospice provider listed as "Atlanta" on the Golden Living

8

website and in Exhibit 3. Based on information and belief, Golden Living

Corporate and/or Hospice Preferred Choice, Inc. also do/does business as

"AseraCare Hospice," through which one or more of the Golden Living Corporate

entities operate or control over 66 hospice care providers located in 19 states. A

full list of these providers, as listed on the Golden Living website, is attached

hereto as Exhibit 3.

19.

Based on information and belief, patients at Golden LivingCenters who

receive hospice care must receive that care from AseraCare hospice.

20.

In 2000, as part of a settlement reached with the Office of the Inspector

General Department of Health and Human Services, Beverly Enterprises, Inc., its

subsidiaries and affiliates, entered into a Corporate Integrity Agreement ("2000

CIA"). This CIA's purpose was "to ensure compliance by Beverly Enterprises,

Inc. with the requirements of Medicare, Medicaid and all other Federal health care

programs" and it required, among other things, that Beverly Enterprises, Inc., its

subsidiaries and affiliates, successors and assigns:

1.      Create and maintain a compliance program to ensure corporate
        compliance with federal regulations (section III.A).

2.      Create a code of conduct that all employees or agents of Beverly
        Enterprises must follow (Section III.B.1).

3.      Create written policies and procedures that ensure that Beverly
        Enterprises, Inc., its subsidiaries and affiliates, and employees or
        agents thereof :

   a.   Are compliant with 42 C.F.R. § 483, *et. seq.* (III.B.2.a.1) and with
        the Medicare Prospective Payment System (III.B.2.a.2);

   b.   Where compliance issues arise, an investigation occurs and a
        corrective action plan is implemented (III.B.2.b);

   c.   Do not retaliate against any person who reports compliance issues
        (III.B.2.c).

4.      Report material deficiencies of care, which includes care "that does
        not meet professionally recognized standards of care," to the Office
        of the Inspector General within 30 days of discovering the material
        deficiency.

21.

The 2000 CIA also provides for exclusion of Beverly Enterprises, Inc., its

subsidiaries and affiliates from participation in Medicare or Medicaid programs in

the event of a breach of its duty to report material deficiencies or otherwise breach

the terms of the 2000 CIA.

22.

In 2004, the 2000 CIA was amended ("2004 CIA Amendment"). In addition

to the requirements under the 2000 CIA, the 2004 CIA Amendment also

specifically required Defendants to prioritize proper staffing of nurses for the care

of their patients (III.B.1.d) and to continue to retain the Long Term Care Institute

10

as Monitors for their compliance with federal law (III.D).  The 2004 CIA

Amendment also was expressly binding on all "successors and assigns."

23.

Currently, Defendants operate under a Corporate Code of Conduct and

Business Ethics (Corporate CIA), required by the 2000 CIA, which states that "the

claims we submit for payment will be just and accurate when we follow our

policies and procedures. . ."  The policies and procedures required by the

Corporate CIA obligate employees to, amongst other things, report all suspected

violations of federal or state regulations to local management, and if the employee

sees no corrective action as to their complaint, report the suspected violations to

members of corporate management.  Furthermore, the Corporate CIA declares that

Defendants will not retaliate against individuals who make such a report of

suspected violations to local or corporate management.

24.

The term of the 2000 CIA and its 2004 CIA Amendment lasted for the

period of time Beverly remains obligated by the payment terms of the Settlement

Agreement, or for nine years from February 2000, whichever is shorter, but in any

event for not less than five years.  During the time the 2000 CIA and the 2004 CIA

11

Amendment were in effect, Defendants violated said agreements, but failed to report said violations.

25.

As of February 2009, the CIAs entered into between Defendants and the federal government had expired. While patient harm and conduct violative of the CIAs had occurred as early as 2007, almost immediately upon expiration of the 2000 CIA and the 2004 CIA Amendment the patient harm and other conduct violative of those agreements increased, but was not reported.

## IV.   **NATURE OF ACTION**

26.

At all times relevant hereto, the Defendants named in the above styled action acted through their agents and employees, and the acts of said agents and employees were within the scope of their agency and employment.

27.

All acts or omissions alleged in the instant Complaint were at the direction of, under the control of, under the management of, ratified by, or the result of policies set by, Golden Living Corporate and/or officers at the Golden LivingCenter or AseraCare Hospice where the alleged conduct occurred.

12

28.

To the extent, if any, that this case is deemed to be a "related action," or to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of filing this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid statutory preemption.

29.

Furthermore, to the extent that allegations or transactions set forth herein are the subject of a civil or administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil money penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, or specific allegations or transactions that are already the subject of the civil suit or administrative civil money penalty proceeding.

13

30.

Defendants knowingly submitted false or fraudulent claims to be paid under the Medicare and Medicaid programs, and received payment under those programs to which they were not entitled but which they failed to return, all in violation of the False Claims Act and the Georgia False Claims Act.

## V.    THE STATUTORY AND REGULATORY FRAMEWORK

31.

Medicare is a program of the United States Government, pursuant to which the United States provides payment (*i.e.* reimbursement) for various healthcare goods and services for qualified persons, primarily the elderly and disabled.  Such payments are made directly to the healthcare provider who provided the goods or services, which provider submits various forms to the appropriate Medicare designee to obtain such payments.  Where Medicare pays reimbursements to hospitals or other "in-patient" facilities, such reimbursements are paid pursuant to "Part A" of Medicare.

32.

Medicaid is a program funded jointly by the United States Government and the states, and administered by the states, pursuant to which payments (*i.e.* reimbursement) are made for various healthcare goods and services for qualified

14

persons, primarily the poor. Such payments are made directly to the healthcare

provider who provided the goods or services, which provider submits various

forms to the appropriate Medicaid designee to obtain such payments.

33.

Statutes and regulations governing the Medicare and Medicaid programs

require health care providers like Defendants to maintain full compliance with all

the rules and regulations governing the programs as a pre-requisite to receiving

payment under the programs. Moreover, providers cannot submit claims for

services that are "of a quality which fails to meet professionally recognized

standards of health care." 42 U.S.C. § 1320c-5(a)(2) (providers cannot submit

Medicare claims for inadequate care); *see also* 42 U.S.C. § 1320a-7b(a)(1)(3)

(criminal penalties for submitting claims when provider knows it has no continued

right to receive payment); 42 U.S.C. § 1320a-7(b)(6)(B) (provider can be excluded

from participation in Medicare for submitting claims for inadequate care).

34.

Congress, in the Omnibus Budget Reconciliation Act of 1987 ("OBRA

'87"), enacted the Nursing Home Reform Act, 42 U.S.C.A. § 1396r et seq.

(hereinafter "the Act"), which took effect on October 1, 1990. A nursing facility,

also known as a "nursing home," is defined in the Act as "an institution...which –

15

(1)     is primarily engaged in providing to residents--

(A)     skilled nursing care and related services for residents who require medical or nursing care,

(B)     Rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

(C)     on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases;...

42 U.S.C.A. § 1396r(a).

35.

The Act mandates that nursing facilities comply with federal requirements relating to the provision of services.  42 U.S.C.A. § 1396r(b).  Specifically, in terms of the quality of life for residents of nursing facilities, the Act states that: "A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."  42 U.S.C.A. § 1396r(b)(1)(A).  "A nursing facility must operate and provide services in compliance with all applicable Federal, State and local laws and regulations...and with accepted professional standards and principles

16

which apply to professionals providing services in such a facility." 42 U.S.C.A. §§ 1396r(d)(4)(A); 1396r(b)(4)(A)(vii) ("The services provided or arranged by the facility must meet professional standards of quality").

36.

Additionally, nursing facilities like Defendants' must "provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a written plan of care which –

> (A) describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met;..."

42 U.S.C.A. § 1396r(b)(2)(A).

37.

Defendants, as owners and operators of nursing facilities, must fulfill the residents' care plans by providing, or arranging for the provision of, *inter alia*, nursing and related services and medically-related social services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, pharmaceutical services and dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident. 42 U.S.C.A. § 1396r(4)(A)(i-iv).

17

38.

The Social Security Act mandates that skilled nursing facilities like
Defendants that participate in the Medicare Program and nursing facilities that
participate in the Medical Assistance Program, also known as Medicaid, meet
certain specific requirements in order to qualify for participation and receive tax-
payer dollars from these programs.  These requirements are set forth at 42 C.F.R. §
483.1, *et seq.*, and "serve as the basis for survey activities for the purpose of
determining whether a facility meets the requirements for participation in Medicare
and Medicaid." 42 C.F.R. § 483.1.

39.

Federal law requires that the care provided by nursing homes be of a
"quality which meets professionally recognized standard[s] of care." 42 U.S.C. §
1320c-5(a)(2).

40.

Federal regulations, when addressing residents' rights under 42 C.F.R. §
483.10, mandate that each resident "has a right to a dignified existence, self-
determination, and communication with and access to persons and services inside
and outside the facility. [and] A facility must protect and promote the rights of
each resident[.]"  The rights that must be protected include:

18

**(b)  Notice of rights and services.**

(1)  The facility must inform the resident both orally and in writing in a language that the resident understands his or her rights and all rules and regulations governing resident conduct and responsibilities during the stay in the facility.

. . . .

**(11) Notification of changes.**

(i) A facility must immediately inform the resident; consult with the resident's physician; and if known, notify the resident's legal representative or an interested family member when there is-

. . . .

(B) A significant change in the resident's physical, mental, or psychosocial status (*i.e.*, a deterioration in health, mental, or psychosocial status in either life-threatening condition or clinical complications); [or]

(C) A need to alter treatment significantly (*i.e.*, a need to discontinue an existing form of treatment due to adverse consequences, or to commence a new form of treatment) . . .

. . . .

**(o) Refusal of certain transfers.** (1) An individual has the right to refuse a transfer to another room within the institution, if the purpose of the transfer is to relocate --

(i) A resident of a SNF from the distinct part of the institution that is a SNF to a part of the institution that is not a SNF, . . .

41.

Federal regulations also address equal access to quality care, under 42

C.F.R. § 483.12(c)(1), requiring that "[a] facility must establish and maintain

19

identical policies and practices regarding transfer, discharge, and the provision of

services under the State plan for all individuals regardless of source of payment."

42.

Federal regulations address facility practices under 42 C.F.R. § 483.13(c),

which requires:

> . . . .
> **(c) Staff treatment of residents.**  The facility must develop and
> implement written policies and procedures that prohibit mistreatment,
> neglect, and abuse of residents and misappropriation of resident property.
> . . . .
>     (2) The facility must ensure that **all alleged violations involving
> mistreatment, neglect, or abuse, including injuries of unknown
> source, and misappropriation of resident property are reported**
> immediately to the administrator of the facility and to other officials in
> accordance with State law through established procedures (including to
> the State survey and certifications agency).
>     (3) The facility must have evidence that all alleged violations are
> thoroughly investigated, and must prevent further potential abuse while
> the investigation is in progress.
>     (4) The results of all investigations must be reported to the
> administrator or his designated representative and to other officials in
> accordance with State law **(including to the State survey and
> certifications agency) within 5 working days of the incident**, and if the
> alleged violation is verified appropriate corrective action must be taken.

(emphasis added).

43.

Federal regulations addressing resident's quality of life, under 42 C.F.R. §

483.15, require that "A facility must care for its residents in a manner and in an

environment that promotes maintenance or enhancement of each resident's quality

of life." This regulation also specifically requires that the facility maintain

"comfortable and safe temperature levels," requiring "facilities initially certified

after October 1, 1990 must maintain a temperature range of 71-81 [degrees]

Fahrenheit." 42 C.F.R. § 483.15(c)(6).

44.

Federal regulations addressing resident assessments, under 42 C.F.R. §

483.20, require that the "facility must conduct initially and periodically a

comprehensive, accurate, standardized, reproducible assessment of each resident's

functional capacity." To that end, the regulation states:

> **(a) Admission orders.** At the time each resident is admitted, the
> facility must have physician orders for the resident's immediate care.
>
> . . . .
>
> **(g) Accuracy of assessments.** The assessment must accurately reflect
> the resident's status.
>
> . . . .
>
> **(k) Comprehensive care plans.**
>
> . . . .
>
>> (2) A comprehensive care plan must be-
>>
>>> (i) Developed within 7 days after completion of the
>>> comprehensive assessment;
>>
>> . . . .
>>
>>> (iii) Periodically reviewed and revised by a team of qualified
>>> persons after each assessment.

21

(3) The services provided or arranged by the facility must-

    (i) Meet professional standards of quality; and

    (ii) Be provided by qualified persons in accordance with each resident's written plan of care.

45.

Federal regulations, when addressing quality of care concerns, mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care." 42 C.F.R. § 483.25. The Federal regulations also provide quality of care guidance as to several specific areas concerned with the care of the elderly. The regulation provides:

**(c) Pressure sores.**  Based on the comprehensive assessment of a resident, the facility must ensure that--

    (1) A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and

    (2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

. . . .

**(g) Naso-gastric tubes.**  Based on the comprehensive assessment of a resident, the facility must ensure that-

. . . .

22

(2) A resident who is fed by a naso-gastric or gastrostomy tube receives the appropriate treatment and services to prevent aspiration pneumonia, diarrhea, vomiting, dehydration, metabolic abnormalities, and nasal-pharngeal ulcers to restore, if possible, normal eating skills.

**(k) Special needs.** The facility must ensure that residents receive proper treatment and care for the following special needs:

. . . .

(2) Parenteral and enteral fluids;

. . . .

(5) Tracheal suctioning

(6) respiratory care

**(l) Unnecessary drugs—**

. . . .

(1) General.  Each resident's drug regime must be free from unnecessary drugs.  An unnecessary drug is any drug when used:

. . .

(iii) Without adequate monitoring

**(m) Medication Errors.**  The facility must ensure that --

(1) It is free of medication error rates of five percent or greater; and

(2) Residents are free of any significant medication errors.

46.

Federal regulations address the staffing of nurses under 42 C.F.R. § 483.30, which requires that a "facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care."  To that end, the regulation states:

23

. . . .

**(e) Nurse staffing information-**

(1) Data requirements.  The facility must post the following information on a daily basis:

(i) Facility name.

(ii) The current date.

(iii) The total number and the actual hours worked by the following categories of licensed and unlicensed nursing staff directly responsible for resident care per shift:

(A) Registered nurses.

(B) Licensed practical nurses or licensed vocational nurses (as defined under State law).

(C) Certified nurse aides.

(iv) Resident census.

(2) Posting requirements.

(i) The facility must post the nursing staffing data specified in paragraph (e)(1) of this section on a daily basis at the beginning of each shift.

(ii) Data must be posted as follows:

(A) Clear and readable format.

(B) In a prominent place readily accessible to residents and visitors.

(C) Public access to posted nurse staffing data. The facility must, upon oral or written request, make nurse staffing data available to the public for review at a cost not to exceed the community standard.

. . . .

(4) Facility data retention requirements.  The facility must maintain the posted daily nurse staffing data for a minimum of 18 months, or as required by State law, whichever is greater.

47.

Federal regulations address specialized rehabilitative services under 42

C.F.R. § 483.45, which state the following:

(a) Provision of services.  If specialized rehabilitative services such
as but not limited to physical therapy, speech-language pathology,
occupational therapy, and mental health rehabilitative services for
mental illness and mental retardation, are required in the resident's
comprehensive plan of care, the facility must—

(1) Provide the required services; or

(2) Obtain the required services from an outside resource (in
accordance with 483.75(h) of this part) from a provider of specialized
rehabilitative services.

48.

Federal regulations addresses pharmacy issues under 42 C.F.R. § 483.60,

stating:

The facility must provide routine and emergency drugs and
biologicals to its residents, or obtain them under an agreement
described in 483.75(h) of this part.

(a) Procedures.  A facility must provide pharmaceutical
services (including procedures that assure the accurate acquiring ,
receiving, dispensing, and administering of all drugs and biologicals)
to meet the needs of each resident.

. . . .

(c) Drug regimen review.

(1) The drug regimen of each resident must be reviewed
at least once a month by a licensed pharmacist.

(2) The pharmacist must report any irregularities to the attending physician and the director of nursing and these reports must be acted upon.

49.

Federal regulations under 42 C.F.R. § 483.65 address infection control

measure a facility must engage in, stating:

The facility must establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection.

(a) Infection control program.  The facility must establish an infection control program under which it—

(1) Investigates, controls, and prevents infections in the facility;

(2) Decides what procedures, such as isolation, should be applied to an individual resident; and

(3) Maintains a record of incidents and corrective actions related to infections.

(b) Prevents spread of infection.

(1) When the infection control program determines that a resident needs isolation to prevent the spread of infection, the facility must isolate the resident.

(c) Linens.  Personnel must handle, store, process, and transport linens so as to prevent the spread of infection.

50.

Federal regulations address administrative requirements for Defendants in

42 C.F.R. § 483.75, stating:

26

A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

. . . .

    (b) Compliance with Federal, State, and local laws and professional standards.  The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

    (c) Relationship to other HHS regulations.  In addition to compliance with the regulations set forth in this subpart, facilities are obliged to meet the applicable provisions of other HHS regulations, including but not limited to those pertaining to…fraud and abuse (42 CFR part 455).  Although these regulations are not in themselves considered requirements under this part, their violation may result in the termination or suspension of, or the refusal to grant or continue payment with Federal funds.

. . . .

    (e) Required Training of Nursing Aides.

        . . .

        (8) Regular In-Service Education

The facility must complete a performance review of every nurse aide at least once every 12 months, and must provide regular in-service education based on the outcome of these reviews.  The in-service training must-

(i)  Be sufficient to ensure the continuing competence of nurse aides, but must be no less than 12 hours per year;

(ii) Address areas of weakness as determined in nurse aides' performance reviews and may address the special needs of residents as determined by the facility staff; and

27

(iii)  For nurse aides providing services to individuals with cognitive impairments, also address the care of the cognitively impaired.

(f) Proficiency of Nurse Aides

The facility must ensure that nurse aides are able to demonstrate competency in skills and techniques necessary to care for residents' needs, as identified through resident assessments, and described in the plan of care.

. . . .

(h) Use of Outside Resources (includes Pharmacy Services)

. . . .

(2) Arrangements as described in section 1861(w) of the Act or agreements pertaining to services furnished by outside resources must specify in writing that the facility assumes responsibility for-

(i) Obtaining services that meet professional standards and principles that apply to professionals providing services in such a facility; and

(ii) The timeliness of the services.

. . . .

(j) Laboratory Services

(1) The facility must provide or obtain laboratory services to meet the needs of its residents.  The facility is responsible for the quality and timeliness of the services.

(2) The facility must-

(i) Provide or obtain laboratory services only when ordered by the attending physician.

(ii) Promptly notify the attending physician of the findings;

. . . .

(iv) File in the resident's clinical record laboratory reports that are dated and contain the name and address of the testing laboratory.

(k) Radiology and Other Diagnostic Services

(1) The facility must provide or obtain radiology and other diagnostic services to meet the needs of its residents. The facility is responsible for the quality and timeliness of the services.

(2) The facility must-

(i) Provide or obtain radiology and other diagnostic services only when ordered by the attending physician; and

(ii) Promptly notify the attending physician of the findings

(l) Clinical Records

(1) The facility must maintain clinical records on each resident in accordance with accepted professional standards and practices that are-

. . . .

(ii) Accurately documented

. . . .

(o) Quality Assessment and Assurance

(1) A facility must maintain a quality assessment and assurance committee consisting of-

(i) The director of nursing services;

(ii) A physician designated by the facility; and

(iii) At least 3 other members of the facility's staff.

(2) The quality assessment and assurance committee-

(i) Meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary; and

> (ii) Develops and implements appropriate plans of
> action to correct identified quality deficiencies.

### 51.

The Nursing Home Reform Act also mandates that the State shall be
responsible for certifying, in accordance with surveys conducted by the state, the
compliance of nursing homes (other than facilities of the State)....The Secretary
[of the Department of Health and Human Services] shall be responsible for
certifying...the compliance of State nursing facilities with the requirements of such
subsections. 42 U.S.C.A. § 1396r(g)(1)(A).

### 52.

The Georgia entity charged with certifying the participation of, and with
receiving incident reports from, nursing homes is the Healthcare Facility
Regulation Division of the Department of Community Health ("DCH"). DCH
rules require that nursing homes report to the Healthcare Facility Regulation
Division f/k/a Office of Regulatory Services for the Department of Human
Resources all incidents of patient death or serious harm within 24 hours of the
occurrence. Ga. Comp. R. & Regs. 290-5-8 and 290-9-43-.06 and O.C.G.A. 31-8-
80, *et. seq   Also see* CMS State Operations Manual for Survey and Enforcement

30

Process for Skilled Nursing Facilities and Nursing Facilities Chapter 7 Internet
Manuals Only Publication # 100-07.

53.

Federal law mandates specific conditions, procedures and criteria that must
be met for a patient to receive hospice care and for that patient to be re-certified to
continue to receive hospice care after the first 90 days of receiving hospice care.
42 C.F.R. 418.00 *et seq.*

54.

Federal regulations define the term "immediate jeopardy" to mean " a
situation in which the provider's noncompliance with one or more requirements of
participation has caused, or is likely to cause, serious injury, harm, impairment, or
death to a resident." Federal regulations define the term "neglect" to mean "failure
to provide goods and services necessary to avoid physical harm, mental anguish, or
mental illness." 42 CFR § 488.301

55.

When a facility is found to have patients in immediate jeopardy, state survey
agencies are authorized, by federal regulations and by the CMS Operations
Manual, to impose termination of the facilities' participation as a Medicare or
Medicaid provider within two days of the finding of immediate jeopardy or to deny

31

payment to the facility for new admissions of patients (CMS State Operations

Manual for Survey and Enforcement Process for Skilled Nursing Facilities and

Nursing Facilities Chapter 7 Internet Manuals Only Publication # 100-07§ 7301A).

## VI. CONDITIONS OF PARTICIPATION IN MEDICARE AND MEDICAID PROGRAMS

56.

As a condition of receiving payment from Medicare each provider must

submit a Medicare Enrollment application, CMS 855a for institutional providers

such as the Defendants, in which the provider agrees to abide by the Medicare

laws, regulations and program instructions that apply to the provider and that

payment of a claim by Medicare is conditioned upon the claim and underlying

transaction complying with the Medicare related laws.

57.

Federal regulations also set forth the requirements for State Fraud and Abuse

detection and investigation programs in 42 C.F.R. §455.1 *et seq.*, which require

that participants in Medicaid programs receive payments only after certifying the

"information [the claim is based on] is true, accurate, and complete," and that the

entity "understand[s] that payment of this claim will be from Federal and State

funds, and that any falsification, or concealment of a material fact, may be

prosecuted under Federal and State laws," upon both making of the claim and endorsing of the check.

58.

Furthermore, the Georgia application for Medicaid enrollment requires providers to comply with state and federal regulations concerning the care they are providing. Georgia Department of Community Health, Department of Medical Assistance Form DMA-2.

## VII.   THE DEFENDANTS' ILLEGAL CONDUCT

### A. Grossly Deficient Medical Care at GLC Northside

59.

The care given to patients residing at GLC Northside often is grossly deficient and not of a "quality which meets professionally recognized standard[s] of care." Attached hereto as Exhibit 4 and incorporated herein is a chart listing patients who received such grossly deficient, inadequate, or substandard care, or care not being rendered at all, as well as the payors for such patients. For each patient whose care was being paid for in whole or in part by Medicare or Medicaid, claims were submitted for payment to Medicare or Medicaid, and payments received have not been returned. Moreover, some patients required additional services, including hospitalizations, to treat medical complications which were

33

being paid for in whole or in part by Medicare or Medicaid and which were a result of deficient, inadequate, or substandard care delivered by Defendants. Some of such grossly deficient, inadequate, or substandard care, or care not being rendered at all are alleged in more detail below.

1. Patient P.M.

60.

In November 2007, Patient P.M. was admitted to GLC Northside with Bells Palsy resulting in paralysis of her left facial muscles. This rendered her unable to blink and put her at risk for developing a corneal ulcer. Relator ordered eye drops and ointments as well as eye dressings to prevent the formation of an ulcer. On December 7, 2007, Relator noted a corneal ulcer. Relator issued orders for differing eye drops and ointments to be administered that would treat the ulcer and prevent further expansion of the ulcer. Despite multiple visits on November 28, December 7, December 9 and December 10 with multiple orders and multiple episodes of nursing education regarding eye drop treatment of Patient P.M., these orders were not followed by nursing.

61.

Relator informed GLC Northside's Executive Director and Director of Nursing of the failure to administer medication for Patient P.M. as well as other

34

observed instances of the nursing staff failing to administer ordered medication on other patients, failing to adequately perform necessary assessments, failure to treat wounds, and not drawing labs.

62.

The nursing staff continued to disregard Relator's orders and as a result, Patient P.M.'s ulcer worsened to the point of causing loss of vision in the affected eye. The Patient was transferred from the building in protest and Relator temporarily suspended admissions to his service until the middle of January 2008.

2. Patient C.R.

63.

Patient C.R. was a Medicaid long term care patient initially admitted to GLC Northside January 26, 2001. C.R. had quadriplegia throughout her stay at GLC Northside and so was incapable of self-injury and was dependent on caregivers for all of the Activities of Daily Living. She also had severe Gastro-Esophageal Reflux Disease and Gastroparesis which requires the use of continuous gastrostomy tube feeding to meet her nutritional and hydration needs. Since Patient C.R. suffered from quadriplegia and was in a fragile condition, Relator ordered that all transfers of C.R. be made by two persons at all times.

35

Notwithstanding these orders, the nursing staff routinely failed to transfer Patient C. R. with two people and generally did not take care when treating Patient C. R. As a result, beginning in early 2009, Patient C.R. was subjected to numerous feeding tube related injuries and complications including four episodes of traumatic removal of her gastrostomy tube (02/06/2009, 04/25/2009, 07/24/2009 and 08/24/2009). Two of these removals (04/25/2009 and 07/24/2009) required transfer to the hospital Emergency Department for reinsertion. These injuries continued to recur despite Relator's constant reiteration of his orders that Patient C.R. be treated with care and be transferred by two persons at all times. At each episode of traumatic feeding tube removal, Relator specifically requested a full investigation with a report of the people involved in the injuries to identify staff education needs. No such investigations were completed. Additionally, Relator reported incidents of feeding tube complications to GLC Northside Administrators and to Golden Living corporate officials, but Relator did not observe any investigation into the incidents involving injury to Patient C.R.

64.

On August 19, 2009, while caring for Patient C.R., the nursing staff caused the skin to be removed from the third and fourth toes of her right foot as well as full removal of her fourth toe nail. This traumatic injury was immediately reported

36

to Relator who was in a meeting with Defendants' officials to discuss his observations of serious care deficiencies at GLC Northside. Relator brought the DON of GLC Northside and Golden Living nursing consultant to Patient C.R.'s bedside to observe the injuries.

65.

Despite specifically highlighting the necessity of proper care plan development and implementation with appropriate training and supervision of staff to both the local and corporate administration, Patient C.R. continued to face complications. On August 24, 2009, she suffered another traumatic removal of her gastrostomy tube. In an effort to increase staff training, Occupational Therapy was consulted to evaluate for bed positioning and staff/caregiver education. On September 18, 2009, Relator was called to evaluate multiple blisters to Patient C.R.'s right hand. The development of these skin conditions was particularly egregious in light of the fact that as a quadriplegic, Patient C.R. was incapable of caring for herself.

66.

Despite the presence of documented wounds, there are no skin care assessments written from September 22, 2009 through October 11, 2009, a period of 19 days. On October 11, 2009, a stage IV wound to the ball of C.R.'s left foot

37

was noted by the fourth floor nursing supervisor.  Relator was notified and gave an

order to have the area non weight bearing at all times and to cleanse with sterile

saline and apply a dressing twice a day.  The fourth floor nursing supervisor was

later terminated by the GLC Northside administration for the discovery and

reporting of this wound.  On October 13, 2009, Relator observed Patient C.R. to be

improperly positioned with left foot drawn under buttocks and with full weight

bearing on surface of wound.  Upon examination, the wound was approximately 6

X 4 cm with central liquefication, foul odor, purulent exudate and palpable tendon

and bone.  The GLC Northside Director of Nursing was summoned to the bedside

and a physical exam was demonstrated by Relator.  On October 14, 2009, Relator

met with GLC Northside Executive Director and reviewed poor care of this patient

and others and specifically mentioned that this injury occurred from poor care

delivery and was expected to be fatal.  Due to the severity of the wound and the

patient's medical comorbidities, patient C.R.'s family elected a palliative care plan

and C.R. was enrolled in hospice care.  On 10/19/2009, Relator observed patient

C.R.'s gastrostomy tube to be inappropriately positioned causing chemical burns to

the patient's abdominal skin and placing her at risk for gastric outlet obstruction.

C.R.'s wound continued to worsen with the left great toe becoming partially

38

detached from the foot by November 4, 2009. Patient C.R. passed away on November 9, 2009.

3. Patient G.G.

67.

Patient G.G. was a sub-acute patient with oxygen dependent Chronic Obstructive Pulmonary Disease and recurrent right hip dislocation. He was initially admitted to GLC Northside on April 27, 2009. On or about July 27, 2009, staff at GLC Northside allowed him to be without supplemental oxygen, causing G.G. to be taken to the emergency room at Northside hospital on July 28, 2009, due to mental status change. The emergency department noted that G.G. seemed confused and that he was taken to the emergency room at the direction of his neurologist.

68.

Although the third floor of GLN Northside is the floor where sub-acute patients are housed, and where the nursing staff is trained to treat sub-acute patients, Patient G.G. was readmitted to the fourth floor on August 3, 2009, and now under the Relator's care. Despite Relator's orders that Patient G.G. receive numerous medications upon his admission to GLC Northside, Patient G.G. did not receive any of his ordered medications the evening of his admission to GLC

39

Northside, and of the seven medications ordered to be administered the following

morning, he only received aspirin in a timely manner. Relator was not notified of

any of these medication errors. Additionally, although oxygen saturation

measurements were ordered each shift, none were completed by nursing. Further,

nursing failed to draw blood for labs ordered by Relator for monitoring of G.G.

69.

Within one day of admission to the fourth floor, Patient G.G. suffered a hip

dislocation as a result of improper care and treatment by nurses who primarily

treated patients receiving long term care, necessitating that Patient G.G. be

transferred to the hospital for relocation of his hip under anesthesia. Following

relocation of his hip, G.G. is again placed on the fourth floor of GLC Northside.

Despite clear orders being placed about the use of a right knee immobilizer to be in

place at all times to prevent right lower extremity flexion and to minimize the risk

of right hip dislocation, Patient G.G. was examined the next day by the Relator in a

wheelchair with his knee immobilizer improperly placed, knee flexed at 90

degrees, and leg rest not elevated. This same patient, who had severe Chronic

Obstructive Pulmonary Disease (COPD) and had been steroid and oxygen

dependent for 3 years, was titrated off oxygen and even sent to therapy without

oxygen by nursing despite orders for continuous oxygen. Due to clear lack of

40

training, expertise and staffing of fourth floor nursing to maintain and monitor this sub-acute patient, Relator demanded transfer of patient to third floor which maintains a better caregiver-to-resident ratio.

70.

Furthermore, Patient G.G. and his spouse were never adequately informed of his rights as a resident of the facility, including, but not limited to, his right to refuse to be relocated from the distinct part of the institution that is a SNF to a part of the institution that is not a SNF.  Patient was therefore transferred to the second floor on November 4, 2009, where failure to properly carry out his care plan resulted in a right hip dislocation within 24 hours of his arrival on the second floor. G.G. was again transferred to the hospital for relocation of his hip under anesthesia.

4. Patient T.B.

71.

Patient T.B. acquired wounds at GLC Northside in the course of his treatment.  These wounds were noted on July 1, 2009, by Relator who notified the nursing staff and the wound care specialist of Patient T.B.'s wounds.  Relator ordered labs, directed nursing and wound care team to change the plan of care and requested referral to the vascular surgeon who had evaluated the patient during his

41

prior hospitalization. Unfortunately, ordered labs were not correctly reviewed with

Relator, the MDS and care plan were not updated, and follow-up consultation with

the vascular surgeon was not made. In the following two week period, only two

nurses' notes even mentioned the presence of wounds but no nursing notes

described the wounds. Clear worsening of wounds was noted by the wound care

specialist on July 13, 2009, and yet no one contacted the Relator to inform him of

the dangerous change in Patient T.B.'s condition. On July 14, 2009, Relator

observed extensive gangrene and osteomyelitis to the toes of the right foot, and stat

blood work revealed critical anemia.

72.

As a result, Patient T.B. was urgently hospitalized and transfused. Patient

T.B. underwent angioplasty to return circulation to the right lower extremity but

ultimately required mid-foot amputation due to the extent of gangrene and

osteomyelitis present on transfer from GLC Northside. Patient T.B. was re-

admitted to GLC Northside following the amputation procedure, but suffered a

fatal cardiopulmonary arrest within 12 hours of his readmission. To Relator's

knowledge, no investigation of this incident was ever made by Defendants, nor

was the incident ever reported to federal and/or Georgia authorities.

42

5. Patient E.J.S.

73.

Patient E.J.S. was a Medicaid long term care patient initially admitted to

GLC Northside June 17, 2005. E.J.S. had quadriplegia throughout her stay at GLC

Northside and so was incapable of self-injury and was dependent on caregivers for

all of the Activities of Daily Living. She also had severe Gastro-Esophageal

Reflux Disease and Gastroparesis which required the use of continuous

gastrostomy tube feeding to meet her nutritional and hydration needs. Since

Patient E.J.S. suffered from quadriplegia and was in a fragile condition, Relator

ordered that all transfers of E.J.S. be made by two persons at all times.

Notwithstanding these orders, the nursing staff routinely failed to transfer Patient

E.J.S. with two people and generally did not take care when treating Patient E.J.S.

For example, this patient suffered four traumatic gastrostomy tube removals

(12/03/2008; 1/17/2009; 6/17/2009 [required transfer to Emergency Department];

9/08/2009 [required transfer to Emergency Department]). E.J.S. also endured

seven episodes of gastrostomy tube clogging and, in fact, required 10 gastrostomy

tube replacements in 13 months. On July 25, 2009, GLC Northside ran out of

stock of continuous tube feeding devices. Patient E.J.S. was then fed by bolus

until stock is replenished, placing her at increased risk of aspiration. Relator

43

requested that Defendants investigate these feeding tube incidents, but no adequate investigation was made, nor were any of these incidents reported to federal and/or Georgia authorities, as required by law and the Defendants' CIAs.

74.

On May 18, 2009, Patient E.J.S. was found with a Fentanyl patch on her body delivering a steady stream of narcotics and putting her at risk of respiratory suppression, emesis, aspiration and death. Patient E.J.S. did not have this schedule II narcotic on her orders.

75.

On October 29, 2009, Relator was urgently called to help Patient E.J.S. who was found by staff with bed in flat position despite orders to have her head elevated at 30 degrees at all times. Upon arrival, E.J.S. was unresponsive and struggling to breathe due to her improper positioning. On initial assessment, E.J.S. was unresponsive to both verbal and painful stimuli, gaze fixed, pupils non-responsive and had an agonal respiratory pattern with no air movement. When Relator tried to use the suctioning machine in her room, it was found to be inoperable, requiring the nursing staff to find an operable machine to bring to Patient E.J.S.'s room. Eventually Patient E.J.S.'s breathing was restored, but not before Patient E.J.S. was deprived of sufficient oxygen such that she may have

44

suffered a brain injury. Relator requested from Defendants an investigation of the incident, but no adequate investigation had occurred, nor has any report been made to federal and/or state authorities as required by law.

6. Patient E.S.C.

76.

Patient E.S.C. was admitted on or about 9:00 p.m. on or about August 4, 2009. She had a history of hyperkalemia which lead to a slow heart beat with hypotension. She also had a history of aspiration of gastric contents leading to respitory failure that required intubation and mechanical ventilation. As a result of this adverse event at the hospital, Patient E.S.C. was not to receive nutrition by mouth and a feeding tube was ordered.

77.

Two hours after Patient E.S.C.'s admission, the nursing staff informed Relator that GLC Northside did not have a pump available with which they could give her continuous feeds, as required. The fact that GLC Northside had no available pumps was known to GLC Northside and Defendants for the previous 36 hours, yet no additional pumps had been ordered and Patient E.S.C. was admitted.

78.

No pump was acquired for the first 40 hours of Patient E.S.C.'s admission, and attempts to feed patient by bolus resulted in nausea to Patient E.S.C. and ultimate refusal of bolus feeding, resulting in insufficient dietary intake. As a result of this insufficient dietary intake, Patient E.S.C. is re-admitted to the hospital with kidney failure.

### 7.  Failure to Monitor and Prevent Further Deterioration of Wounds

79.

In 2008, GLC Northside was selected to participate in a "wound care specialist" program. Defendants began a national policy of employing wound care specialists at their facilities nationwide. The responsibility of a wound care specialist is to monitor and treat wounds that patients develop while in the care of Defendants.

80.

Initially, and for a substantial period of time, GLC Northside had one wound care specialist who was in charge of treating the wounds of all patients residing at the facility on a daily basis. At that time and presently, GLC Northside can have 230 patients in its care at any one point in time. It was not until some time later that Defendants hired a second wound care specialist.

81.

GLC Northside's wound care specialists work normal business hours during the week leaving the facility without any nursing personnel assigned to care for wounds after hours or on weekends. Moreover, the wound care specialist is unable, on a daily basis, to adequately monitor and treat the wounds of all the patients at GLC Northside. As a result, it is not uncommon for patients' wounds to worsen while in the care of Defendants. Such inadequate wound care has caused patients to suffer amputations and even led to the deaths of Patients T.B. and C.R.

82.

Although the wound care specialist was typically a Licensed Practical Nurse (LPN), and therefore did not have prescribing rights, this person was allowed to write orders in the chart which were then acted upon without involvement of the patient's attending physician. Also, significant changes of condition were routinely not reported to the attending physician

8. Inadequate Record Keeping to Allow for Proper Patient Care

83.

The nursing staff does not complete contemporaneous nursing notes on a daily basis. Relator has observed that when notes are completed, they are not detailed nor are they contemporaneously placed into a patient's chart for use by the

47

attending doctor or treating physician. The failure to adequately complete nursing notes is chronic and pervasive throughout the facility, putting all patients at risk and making the care of all patients deficient.

84.

The systematic failure to monitor daily patient information and assess changes in conditions of patients resulted in harm to patients and increased instances of re-admission to hospital facilities. Furthermore, on multiple occasions, changes of condition and adverse incidents go unreported to attending physicians. In the absence of a nursing report, the attending physician cannot gain knowledge of the patient's actual condition until such time as the next physician visit, which visits are limited in frequency by Medicare regulations absent such adverse changes or incidents of harm.

85.

Where members of the nursing staff fail to monitor a patient and make an entry in their chart of an observed condition, they will "true up" the medical records by filling in missing entries several days later or adding backdated information to the patient chart without indicating that such backdated information was a late entry to the chart.

48

86.

Defendants have purchased and installed at some or all of their facilities nationwide a medical software program entitled CareTracker. The program is designed to electronically track such important information as resident bowel and bladder function, resident mood, resident behavior, resident Activities of Daily Living (including resident's abilities and needs for bed mobility, transfer ability, ambulation, dressing, eating, toileting, personal hygiene, and bathing) and resident meal log.

87.

To function properly the CareTracker program requires that the nursing staff enter data on a per shift basis **and** that the nursing staff access the data stored in the program on a daily basis to monitor changes in the patients' condition or other trends that may indicate a developing adverse condition. When used properly, CareTracker will give the nursing staff, and then the attending physician, warning of a minor problem as it arises and before it becomes a major incident.

88.

However, the GLC Northside nursing staff does not use the CareTracker system in the way it was designed to be used. First, the data that the nursing staff is required to enter into the CareTracker system is not entered every shift. Second,

49

the data is not accessed and reviewed by the nursing staff on a daily basis, such that changes in condition or other trends are not brought to the attention of attending physicians. As a result of the nursing staff's inability or failure to access and monitor the CareTracker data, attending physicians have not been informed of changes in condition. Third, the entered information is not audited for accuracy or completeness often resulting in incorrect or insufficient information being documented. Fourth, at the beginning of the following month, the information stored in CareTracker is simply printed in bulk and inserted in the patient's active medical record giving the impression to surveyors that this required information was in fact entered and assessed in an accurate and timely manner.

89.

Relator discovered that the nursing staff was not accessing CareTracker data to find changes in condition during his treatment of Patient S.D. in August 2009, where, upon asking to review the CareTracker information for Patient S.D., both the Assistant Director of Nursing for GLC Northside and the supervisory nurse for the Patient S.D.'s floor told him that they did not know how to retrieve this information and that they had not been trained to use it. Ultimately, Relator accessed CareTracker and called up a bowel movement report (a tool to help with identifying important potential complications such as fecal impaction or bowel

50

obstruction) which showed no BM or small BM in last 9 shifts for residents on the floor and showed that only two of the fifteen patients flagged by this report actually had complete data for all 9 shifts. For none of these patients was the attending physician notified of this important change of condition. This specific incident, and the deficiencies in training associated with it were specifically conveyed to local and corporate administrative staff such that they were aware of the deficiencies in the use of CareTracker and the fact that the policies and procedures implemented by Defendants to ensure the proper use of CareTracker in their facilities nationwide were deficient.

90.

The existence of such deficiencies in inputting, accessing, or monitoring the data stored in CareTracker is effectively concealed through end of the month print outs of all CareTracker data which are then placed into patient charts and give the appearance, to auditors reviewing such patient files, that the printouts, or documents similar to them, are consistently updated.

9. Failure to Provide Adequate Staffing to Sub-Acute Patients

91.

Proper nursing care for sub-acute patients (*i.e.*, patients requiring skilled nursing care because of their recent admission from a hospital) requires

51

substantially more nurses than proper care for long term care patients because sub-acute patients require more frequent nurse assessments and more complicated treatment. The extra work required to care for sub-acute patients necessitates more nurses per patient than is required for long term patient care.

92.

GLC Northside, its administrators, and its employees consider the third floor to be the "sub-acute floor." To accommodate for the needs of their sub-acute patients, the nursing staff to patient ratio on the third floor is significantly greater than that on the second or fourth floors.

93.

GLC Northside, its administrators, and its employees consider the second and fourth floors to be "long term care" floors. These floors have on duty significantly less nurses per patient than the third floor. Accordingly, the nursing staff for the second or fourth floors is not equipped to adequately treat sub-acute patients.

94.

GLC Northside regularly housed significantly more sub-acute patients than it had beds for on the third floor during the time period relevant to the allegations set forth in the instant complaint. Thus, GLC Northside regularly placed sub-acute

52

patients on the second and fourth floors of that facility.  The second and fourth

floors were inadequately staffed to manage the care required for sub-acute patients.

### 10.  Back-dating and Falsification of Medical Records at GLC Northside

95.

Medical records of patients at GLC Northside have been falsified and back-

dated throughout the time period alleged herein.  Defendants and their employees

or agents engaged in other record keeping activities that specifically mislead state

auditors and other reviewing parties from discovering the staff's failures to monitor

daily and keep accurate patients records that can be used by treating physicians.

96.

The nursing staff routinely engages in falsification of Medical

Administration Records to cover up the fact that many patients admitted after 5

p.m. do not receive medication until the next morning at the earliest.

97.

It is not uncommon for wound care notes and other nursing care notes to be

absent from a chart upon an attending physician's review of a chart, but after

complaints to the nursing staff, the missing notes are placed in the chart, but back-

dated to the time when they should have been entered.  These back-dated notes

53

give no indication that they were entered late, a fact which would deceive anyone auditing or reviewing the chart but who does not have personal knowledge of the nursing staff's back-dating practice.

98.

Routinely, patients' records are found to contain missing data concerning feedings, checks of vital signs, wound care treatments, administration of medications and other routine tasks that the nursing staff is to provide. Weeks later, upon review of these records, nurses have initialed or otherwise indicated that treatment was given on dates when there previously was no such entry. In many circumstances, such after-the-fact chart entries are false, in that the care alleged to have been given never was given, or was impossible. For instances, after the fact entries often indicate that a patient ate food from a tray when the patient can only take nutrition by feeding tube, *e.g.* Patient E.J. and Patient E.J.S. Relator has observed instances where as many as 40% of the entries for a patient are false, inaccurate, or missing.

99.

Relator reported the incidents of back-dated nursing observations and notes to nursing supervisors and the culpable nurses themselves. Upon information and

54

belief, Defendants are also aware that such behavior occurs, but no action has been taken to stop the fraudulent behavior.

### 11. Other Deficiencies of Care

100.

From January 4, 2010, until at least January 14, 2010, but possibly longer, two long term care patients, Patient H.H. and Patient C.R.2, (one of whom is covered by Medicaid) were kept in a room with no working heater. This time period was unusually cold in the area of GLC Northside with the low temperature averaging 18 degrees Fahrenheit. Defendants were aware of this problem due to complaints by not only the residents themselves, but also by the maintenance personnel at the facility who explained to Defendants that in order to fix the room's heater the patients must be moved.

101.

As a result of their failure to move Patients H.H. and C.R.2. to allow the heater to be repaired, one of Defendants' maintenance employees quit in protest of their inaction.

102.

In December 2009, GLC Northside suffered a scabies outbreak. The cause of this outbreak was due to the failure of the nursing staff to engage in proper

55

infection control, and, as a result, the entire second floor had to be quarantined and treated.

103.

The widespread general care deficiencies stated in this instant complaint have led to specific harm for a number of patients and have resulted in a dramatic increase in re-hospitalization rates for patients admitted to GLC Northside for sub-acute care.  These rates have been two to three times as frequent from September 2008 to the present as they had been prior to such deficiencies being allowed to occur at GLC Northside, causing unnecessary Medicare and Medicaid reimbursements to hospitals and other providers.

12. <u>Such Deficiencies of Care have Placed Patients in Immediate Jeopardy</u>

104.

Defendants have not reported, nor have they adequately investigated, the incidents and deficiencies of care described in paragraphs 62 through 104, even though such reporting and investigation is required by regulations, is required of employees by the Corporate CIA, and was required under the 2000 CIA and the 2004 CIA Amendment under which Defendants were, or are, operating.

56

105.

By permitting the care deficiencies described in paragraphs 62 through 104 to occur, and by failing to report or investigate these incidents, the patients in the care of Defendants at GLC Northside are considered to be in immediate jeopardy of harm.

106.

If Defendants had reported the incidents described in paragraphs 62 through 104 to the appropriate authorities, as required by law and by their CIAs, the Georgia survey agency could have found Defendants' patients to have been in immediate jeopardy, which could have caused Defendants' participation in Medicare and/or Medicaid programs to have been terminated.

## B. GL Corporate Policies Causing Deficient Patient Care and/or False Billing Nationwide

### 1. Failure to Provide Appropriate Pharmaceutical Care

107.

PharMerica is a pharmacy provider that is believed to have been an affiliate of Beverly Enterprises, Inc. prior to the merger described in paragraph 12.

108.

For the past several years, PharMerica had a contract with Defendants to

provide them with medication for all of their patients in all of their facilities

nation-wide.

109.

Defendants have a national policy to admit patients to their nursing homes at

any time, including after 5:00 PM on weekdays, and on the weekends. However,

PharMerica's policy, which is well known to Defendants, is that PharMerica

pharmacy services are restricted after 5:00 and on weekends. Accordingly, they

will not immediately fill prescriptions for patients of Defendants admitted after 5

p.m. and instead these patients' medications will be delivered the next business

day. This also means that patients whose prescription(s) run out after 5 p.m. on

Friday often do not receive their medication until Monday.

110.

Relator complained of this problem to Defendants on several occasions,

beginning in late 2007, and in early 2009 began urging Defendants to restrict

admissions o hours of full pharmacy services, which Defendants refused to do.

GLC Northside's DON later informed Relator that PharMerica had restricted

58

pharmacy services after 5 p.m. and on weekends because such policies were "cost effective."

111.

Defendants have failed to provide pharmaceutical services sufficient to meet the needs of each resident of GL nursing facilities, leading to patients routinely not receiving medication for significant periods of time, particularly upon admission, despite physician's orders that patients receive medication.  Defendants' VP of Pharmacy Services acknowledged, in an email dated August 5, 2009 and distributed to corporate leadership, that pharmacy service failures at GLC Northside "result[ed] in excessive time without the needed medication for some of our residents."  These routine failures to medicate patients placed patients in serious risk of harm and have resulted in grievous injury to patients under Defendants' care.

112.

These medication deficiencies are one cause of the readmission rates for GLC Northside patients being three times as frequent as they should be, and have not only caused specific harm to a number of patients, but also caused unnecessary Medicare or Medicaid reimbursements to hospitals and other providers.

59

113.

Furthermore, Defendants and their nursing staff have hidden this deficiency from auditors and other reviewing entities by falsifying residents' Medication Administration Record ("MAR"), hiding the fact that no medication was given to the patient upon admission by altering the MARs to give the appearance that the patient was admitted to the facility later than they actually were.

2. Certification and Re-certification for Hospice Care Patients Who Do Not Meet Medicare Criteria For Hospice

114.

In February 2005, Relator was hired as Medical Director of AseraCare Hospice Atlanta ("AseraCare Atlanta") and served in that capacity until his termination in August 2006.  At the time Relator became Medical Director of AseraCare Atlanta, AseraCare Atlanta was providing hospice services to patients at multiple locations, including Golden Living facilities, patients' homes, and personal care homes.

115.

In order for a patient who is eligible for Medicare to receive hospice benefits under Medicare, the patient must, *inter alia*, receive a comprehensive assessment and be certified as having a "terminal condition," that is, a condition whose prognosis is that the patient's life expectancy is less than 180 days (six months).

60

Such patient's condition and prognosis also must be periodically reviewed by the

hospice provider, and the patient must be re-certified by the Hospice Medical

Director or the patient's attending physician as having a terminal condition (*i.e.*, a

life expectancy of less than six months) in order to continue receiving hospice

benefits under Medicare.

116.

Immediately after becoming Medical Director for AseraCare Atlanta,

Relator observed that roughly 39% of the 85 patients receiving hospice care from

AseraCare Atlanta had been receiving hospice benefits for greater than six months.

In fact, two of these patients had been re-certified for, and had received, hospice

benefits for over 1000 days, and the average length of time for which these patients

had been receiving hospice benefits was over 400 days.

117.

Upon making this discovery, Relator promptly worked to de-certify those

patients receiving hospice benefits under Medicare who were no longer "terminal"

and began applying Medicare guidelines for determining eligibility of new patients

and for re-certification of existing patients.  Relator set up Interdisciplinary Teams

to review regularly each hospice patient's eligibility for hospice benefits and plan

of care.

118.

Nonetheless, during his tenure at AsercaCare Atlanta, Relator continually

fought with AseraCare administrators and their Golden Living Corporate superiors

to apply Medicare guidelines for initial certification for hospice benefits and to

apply Medicare guidelines for initial certification and to de-certify and remove

from hospice care patients who no longer met Medicare criteria for hospice care.

119.

Over the course of 2005 and 2006, the patient census of AseraCare Atlanta

grew and remained at a level of over 100 patients, and thus, a second medical

director was hired and the patient census was divided between the two medical

directors. Relator cautioned AseraCare Atlanta Executive Director at the time that

both teams have to use the required Medicare criteria to admit only appropriate

patients and to use these same criteria to ensure patients are discharged from

Hospice when no longer appropriate.

120.

In August of 2006, Golden LivingCenter – Kennestone was undergoing a

state survey and the surveyors were questioning the appropriateness of patients

receiving hospice care from AseraCare Atlanta at the management of the second

medical director.

121.

AseraCare Atlanta Executive Director asked Relator to meet with State surveyors to vouch for the appropriateness of the patients enrolled in hospice with AseraCare Atlanta at Golden LivingCenter – Kennestone.  Relator was reluctant to meet with the state surveyors since these patients were under the direction of the second medical director, but Relator was told this medical director was unwilling or unable to meet with the survey team.  Upon information and belief, the number of patients at Golden LivingCenter – Kennestone who were on hospice care was unusually high.

122.

Relator met with the state survey team but limited his remarks to a recitation of Medicare hospice eligibility criteria and a statement of his interdisciplinary team's procedures for reviewing and recertifying each patient's hospice medical eligibility.  Immediately following this meeting, he called the AseraCare Atlanta Executive Director and emphasized again that Medicare criteria for enrollment and de-certification must be applied throughout the census of AseraCare Atlanta. Relator further emphasized that the medical opinion of the certifying physician regarding a patient's terminal condition must control, and could not be over-ridden by facility or AseraCare Atlanta administrators.

123.

The next day, Relator was terminated from his position as Medical Director at AseraCare Atlanta. Relator received written notification of termination on August 8, 2006, with an effective date of termination listed as close of business October 8, 2006, but was told by AseraCare Atlanta Executive Director to immediately cease all duties including attending Interdisciplinary Team meetings. Such termination, perhaps coincidentally, followed shortly the acquisition of Beverly Enterprises, Inc. and its subsidiaries by a private equity fund.

124.

After Dr. Micca was terminated as Medical Director of AseraCare Atlanta, AseraCare Atlanta discontinued the regular comprehensive patient reviews of hospice patients' condition initiated by Dr. Micca and required by Medicare regulations. This comprehensive IDT meeting format was replaced with a procedure whereby a patient's condition was reviewed and considered only if there was some problem or "significant" change in condition. In fact, following Dr. Micca's termination, upon information and belief patient's names often would simply be read at IDT meetings, following which a designated team member simply would say "no change" and the next patient's name would be read. This change in procedure meant that patients whose condition may stabilize, and who

64

may therefore no longer be "terminal" or otherwise eligible for hospice, are less likely to be de-certified.

125.

After his termination as Medical Director of AseraCare Atlanta, Dr. Micca nevertheless continued to treat, as the attending physician, patients receiving hospice care through AseraCare Atlanta. Since his termination, Dr. Micca has encountered numerous instances where he noted that a patient receiving hospice services had stabilized and was thus no longer terminally ill, whereupon he instructed the hospice nurse caring for the patient to request decertification of the patient at the next appropriate IDT meeting. These requests for decertification were denied and were over-ridden by the AseraCare Atlanta Medical Director. One such patient, who Dr. Micca finally succeeded in having removed from hospice care following hospice staff's providing her morphine against her will and contrary to Dr. Micca's instructions, is still alive today (over three years after AseraCare Atlanta attempted to keep her on hospice inappropriately).

126.

Defendants have a pattern and practice of certifying, and re-certifying, for hospice benefits, patients who do not meet Medicare eligibility requirements for hospice benefits. In fact, based upon information and belief, even if the Medical

65

Director for AseraCare Hospice Atlanta decides that a hospice patient should be decertified for hospice care, the decision is sent to a "Corporate Professional Services Team" and to a corporate medical director, in an effort to over-ride the decision to decertify.

### 3. Inadequate Wound Care

127.

The GL defendants have implemented a policy in many of their nursing facilities, whereby all wounds of any patient only can be monitored and treated by a "wound care specialist." The responsibility of a wound care specialist is to monitor and treat wounds that patients develop while in the care of Defendants.

128.

Upon information and belief, other Golden LivingCenters also have such numbers of patients that a single "wound care specialist" cannot adequately monitor and treat the wounds of all the patients in the facility. In fact, when patient E.J. was at another Golden Living facility, she developed a leg fracture and wounds due to improper care, causing her to be transferred to a hospital for treatment. E.J.'s wounds ultimately led to amputation of her leg above the knee. Because of E.J.'s condition upon admission, emergency department personnel filed a police report and that Golden Living facility is facing a criminal investigation.

66

129.

Relator has brought this deficiency in care to the attention of corporate management and has complained of the need for Golden LivingCenters to properly train their nursing staff on the prevention, detection, monitoring and treatment of patient wounds, but such complaints have not been acted upon.

4. Arbitrary and Illegal Limitation of Patient's Rehabilitative Therapy

130.

Prior to March 2009, Defendants implemented a national policy that therapy sessions for patients whose health care costs are covered by private insurers cannot be more than 20% of the per diem payment that Defendants receive for the patient's care.

131.

This arbitrary limitation resulted in therapy services provided to these privately insured patients by Defendants nationwide to be well below the standard of care. Furthermore, such disparate treatment of residents violates federal regulations.

132.

Despite Relator's complaints to both local and national leadership of Defendants concerning this corporate policy, the policy has not been changed and

the arbitrary limitation of such services continues to exist nationwide.

VIII.   **DEFENDANTS' KNOWLEDGE OF GROSSLY DEFICIENT CARE AND PATIENTS IN IMMEDIATE JEOPARDY OF HARM**

133.

Relator has reported all incidents of patient care alleged herein to local management as well as to officials at all levels of management of Golden Living Corporate. The reported care deficiencies began as early as August 2007, when there was a significant turnover in leadership, and Relator began reporting the deficiencies to local leadership. Furthermore, in early 2009, Relator began to report the deficiencies of care alleged herein to Defendants' corporate officers. From this time going forward, Relator began reporting regularly to Defendants all the types of care deficiencies at GLC Northside that had caused, and were likely to continue causing, harm to not only his patients, but patients throughout the facility. Relator also reported to Defendants an observed unwillingness, or inability, to correct said deficiencies.

134.

The systemic and repeated patient care deficiencies caused Relator on multiple occasions, including June 1, July 29 and August 17, 2009, to request that GLC Northside suspend new patient admissions until these deficiencies were requested. Defendants refused Relator's requests.

68

135.

On or about September 24, 2009, Relator reported to Defendants data he had uncovered concerning re-admission rates for patients at the facility, both those under his care and supervision as well as others, in an effort to demonstrate the pervasiveness of the care deficiencies at the facility and to encourage the administrators to suspend admissions until such problems had been resolved.

136.

Despite Relator's complaints and reports of patient harm and care deficiencies, Defendants took no adequate steps to correct the problems, nor did they undertake adequate investigation of the harm caused or deficiencies reported by Relator.  In fact, such patient care deficiencies are continuing and on-going.

137.

Furthermore, the incidents alleged herein were not reported to the appropriate authorities as required by law and as would have been required by the 2000 CIA and the 2004 CIA Amendment.

138.

Had such reports been made, the state survey agency could have found patients to be in immediate jeopardy and could have terminated one or more

69

Defendants' participation in Medicare or Medicaid programs, in which case they

would not have been eligible to receive any payments for the time period under

which their patients were in immediate jeopardy of harm.

## COUNT I – FEDERAL FALSE CLAIMS ACT CLAIMS AGAINST GOLDEN LIVING CORPORATE DEFENDANTS AND GGNSC ATLANTA, LLC d/b/a GOLDEN LIVINGCENTER NORTHSIDE

139.

Relator re-alleges and incorporates by reference paragraphs 1 through 113

and 127 through 138 as though fully set forth herein.

140.

Defendants to Count I ("Count I Defendants") presented, or caused to be

presented, to the United States government, through its intermediaries, false or

fraudulent claims for payment, or made, used, or caused to be made or used a false

record or statement to get a false or fraudulent claim paid by the United States

government, as alleged herein, in violation of the False Claims Act, 31 U.S.C. §

3729(a).

141.

Specifically, the care provided to patients as alleged herein was

representative of the absence of care or inadequate care rendered to residents of

GLC Northside. The nursing care, wound care, medication administration, daily

monitoring, and other issues alleged herein, all of which were the responsibility of

Count I Defendants and their agents was either not rendered at all or was only

rendered in contravention of the rules and regulations of Medicare and Medicaid

programs, as described above, meaning the services provided were of a quality

which failed to meet professionally recognized standards of health care.  On each

of these claims, Count I Defendants requested false or fraudulent levels of

reimbursement that either did not correspond to the actual services performed, if

any were performed, or requested reimbursement for services that were not billable

under the rules and regulations of the Medicare and Medicaid programs, as

described above.  The United States and the State of Georgia, through the

Medicare and/or Medicaid Programs, paid Count I Defendants these false or

fraudulent claims.  Count I Defendants have failed to reimburse the United States

such payments received for such claims.

142.

Count I Defendants' claims for payment were for the provision of services

that were not rendered, or were of a quality that failed to meet the standards

required by the federal regulations described in paragraphs 33 through 58.

143.

Through their enrollment in the Medicare program, specifically form 855a, Count I Defendants agreed to abide by the Medicare laws, regulations and program instructions that apply to them and that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with the Medicare related laws. By enrolling in the Medicaid program, Count I Defendants agree to abide by all Medicare and Medicaid laws, rules and regulations.

144.

Count I Defendants' claims for reimbursement were each false and fraudulent because Count I Defendants did not perform the procedure which they billed for, or because they did not perform procedures they were required to provide in accordance with the professionally recognized standard of care as required by the rules and regulations of the Medicaid and Medicare programs. Where possible, in its care for its patients and for each of the claims, Count I Defendants performed no reimbursable services, or more simple or partial procedures, such that Count I Defendants should not have been compensated at all, or only compensated at a lower rate of reimbursement, or procedures that did not meet the rules and regulations of the programs and also failed to meet professionally recognized standards of health care.

145.

Count I Defendants presented or caused to be presented these claims for reimbursement of services, or for payment, alleged in this Count I, to the Medicare or Medicaid programs, either knowing such claims were false and fraudulent, or with reckless disregard or deliberated ignorance of the truth or falsity of the claims. 31 U.S.C. § 3729; *see also* S. Rep. No. 615, 96th Cong., 2d Sess. 5-6 (1980) (The False Claims Act encompasses "the person who seeks payment without regard to his eligibility and with indifference for requirements of eligibility").

146.

Also, the failure to meet professional standards of care for these patients resulted in re-admissions of patients to hospitals and other facilities, which caused further billings to Medicare or Medicaid that, but for Count I Defendants' grossly deficient, substandard or non-existent care, would not have otherwise occurred.

147.

Under the terms of the False Claims Act, Count I Defendants are jointly and severally liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicare or Medicaid programs, as described herein, plus three (3) times the amount of damages that the Government sustained because of the acts of Defendants.

## COUNT II - FEDERAL FALSE CLAIMS ACT CLAIMS AGAINST GOLDEN LIVING CORPORATE DEFENDANTS, THE DEFENDANTS LISTED IN EXHIBIT 1, AND JOHN DOE DEFENDANTS 1 THROUGH 308

148.

Relator re-alleges and incorporates by reference paragraphs 1 through 58,

107 through 113, and 127 through 138, as though fully set forth herein.

149.

Defendants to Count II ("Count II Defendants") presented, or caused to be

presented, to the United States government, through its intermediaries, false or

fraudulent claims for payment, or made, used, or caused to be made or used a false

record or statement to get a false or fraudulent claim paid by the United States

government, as alleged herein, in violation of the False Claims Act, 31 U.S.C. §

3729(a).  Count II Defendants have failed to reimburse the United States payments

received on such claims.

150.

Specifically, the care provided to patients as alleged herein was

representative of the absence of care or inadequate care rendered to residents of

Count II Defendants' facilities.  The nursing care, wound care, medication

administration, daily monitoring, and other issues alleged herein, all of which were

the responsibility of Count II Defendants and their agents was either not rendered

at all or was only rendered in contravention of the rules and regulations of
Medicare and Medicaid programs, as described above, meaning the services
provided were of a quality which failed to meet professionally recognized
standards of health care. On each of these claims, Count II Defendants requested
false or fraudulent levels of reimbursement that either did not correspond to the
actual services performed, if any were performed, or requested reimbursement for
services that were not billable under the rules and regulations of the Medicare and
Medicaid programs, as described above. The United States and the State of
Georgia, through its Medicaid or Medicare Programs, paid Defendants these false
or fraudulent claims.

151.

Count II Defendants' claims for payment were for the provision of services
that were not rendered, or were of a quality that failed to meet the standards
required by the federal regulations described in paragraphs 33 through 58.

152.

Through their enrollment in the Medicare program, specifically form 855a,
Count II Defendants agreed to abide by the Medicare laws, regulations and
program instructions that apply to them, and that payment of a claim by Medicare
is conditioned upon the claim and underlying transaction complying with the

75

Medicare related laws.  By enrolling in the Medicaid program, Count I Defendants

agree to abide by all Medicare and Medicaid laws, rules and regulations.

153.

Count II Defendants' claims for reimbursement were each false and

fraudulent because Count II Defendants did not perform the procedure which they

billed for or because they did not perform procedures they were required to provide

in accordance with the professionally recognized standard of care as required by

the rules and regulations of the Medicaid and Medicare programs.  Where possible,

in its care for its patients and for each of the claims, Count II Defendants

performed no reimbursable services, or more simple or partial procedures, such

that Count II Defendants should not have been compensated at all, or only

compensated at a lower rate of reimbursement, or procedures that did not meet the

rules and regulations of the programs and also failed to meet professionally

recognized standards of health care.

154.

Count II Defendants presented or caused to be presented these claims for

reimbursement of services, or for payment, alleged in this Count II, to the

Medicare or Medicaid programs, either knowing such claims were false and

fraudulent, or with reckless disregard or deliberate ignorance of the truth or falsity

76

of the claims. 31 U.S.C. § 3729; *see also* S. Rep. No. 615, 96th Cong., 2d Sess. 5-6 (1980) (The False Claims Act encompasses "the person who seeks payment without regard to his eligibility and with indifference for requirements of eligibility").

155.

Also, the failure to meet professional standards of care for these patients resulted in re-admissions of patients to hospitals and other facilities, which caused further billings to Medicare or Medicaid that, but for Count II Defendants' grossly deficient, substandard or non-existent care, would not have otherwise occurred.

156.

Under the terms of the False Claims Act, Count II Defendants are jointly and severally liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicare or Medicaid programs, as described herein, plus three (3) times the amount of damages that the Government sustained because of the acts of Count II Defendants.

## COUNT III – FEDERAL FALSE CLAIMS ACT CLAIMS AGAINST HOSPICE PREFERRED CHOICE, INC., GL HOLDING DEFENDANTS AND JOHN DOE DEFENDANTS 309 THROUGH 374

### 157.

Relator realleges and incorporates by reference paragraphs 1 through 58 and 114 through 126 as though fully set forth herein.

### 158.

Defendants to Count III ("Count III Defendants") presented, or caused to be presented, claims for reimbursement of services, and received payment for hospice services provided to patients who were not eligible for hospice services. Such claims were presented to, and payments received from, the Medicare or Medicaid programs, and Count III Defendants either knew such claims were false or fraudulent, or acted with reckless disregard or deliberate ignorance of the truth or falsity of the claims. Count III Defendants have failed to reimburse the United States for all such payments received.

### 159.

Under the terms of the False Claims Act, Count III Defendants are jointly and severally liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicare or Medicaid programs, as described

78

herein, plus three (3) times the amount of damages that the Government sustained

because of the acts of Count III Defendants.

### COUNT IV – GEORGIA FALSE CLAIMS ACT CLAIMS AGAINST GOLDEN LIVING CORPORATE DEFENDANTS AND GGNSC ATLANTA, LLC d/b/a GOLDEN LIVINGCENTER NORTHSIDE

160.

Relator realleges and incorporates by reference paragraphs 1 through 113

and 127 through 138 as though fully set forth herein.

161.

Defendants to Count IV ("Count IV Defendants") presented, or caused to be

presented, to the State of Georgia, false or fraudulent claims for payment, or made,

used, or caused to be made or used a false record or statement to get a false or

fraudulent claim paid by the State of Georgia, as alleged herein, in violation of the

Georgia False Claims Act, O.C.G.A. § 49-4-168.1.

162.

The claims alleged in the prior paragraph were false or fraudulent, in that

they falsely certified that the claims submitted for payment met the conditions

described in paragraphs 56 through 58, namely that the claims were truthful, that

there existed no concealment of material fact, and that the care provided was in

compliance with all state and federal laws and regulations, even though in reality

Count IV Defendants failed to disclose the grossly deficient nature of the care
provided in the transactions which formed the basis for their claims.

163.

The false certifications alleged in this Count IV were made with the
knowledge that they were false, in deliberate ignorance of the truth or falsity of the
certification, or in reckless disregard of the truth or falsity of the certification.

164.

Also, the failure to meet professional standards of care for these patients
resulted in re-admissions of patients to hospitals and other facilities, which caused
further billings to Medicaid that, but for Count IV Defendants' grossly deficient,
substandard or non-existent care, would not have otherwise occurred.

165.

Furthermore, the failure to report incidents of deficient care, as required by
federal regulations, and the harm caused by such deficient care, allowed Count IV
Defendants to continue to admit patients and bill for the care of patients, despite
the fact that reporting of such incidents possibly would have resulted in
termination of Count IV Defendants' participation in the Medicaid program.

166.

Under the terms of the Georgia False Claims Act, Count IV Defendants are

jointly and severally liable for a penalty of from $5,500 to $11,000 for each false

claim submitted for payment under the Medicaid program, as described herein,

plus three (3) times the amount of damages that the State of Georgia sustained

because of the acts of Count IV Defendants.

## COUNT V – GEORGIA FALSE CLAIMS ACT CLAIMS AGAINST GOLDEN LIVING CORPORATE DEFENDANTS AND DEFENDANTS LISTED IN EXHIBIT 1

167.

Relator re-alleges and incorporates by reference paragraphs 1 through 58,

107 through 113, and 127 through 138 as though fully set forth herein.

168.

Defendants to Count V ("Count V Defendants") presented, or caused to be

presented, to the State of Georgia, false or fraudulent claims for payment, or made,

used, or caused to be made or used a false record or statement to get a false or

fraudulent claim paid by the State of Georgia, as alleged herein, in violation of the

Georgia False Claims Act, O.C.G.A. § 49-4-168.1.

169.

The claims alleged in the prior paragraph were false or fraudulent, in that they falsely certified that the claims submitted for payment met the conditions described in paragraphs 57 and 58, namely that the claims were truthful, that there existed no concealment of material fact, and that the care provided was in compliance with all state and federal laws and regulations, even though in reality Count V Defendants failed to disclose the grossly deficient nature of the care provided in the transactions which formed the basis for their claims.

170.

The false certifications alleged in this Count V were made with the knowledge that they were false, in deliberate ignorance of the truth or falsity of the certification, or in reckless disregard of the truth or falsity of the certification.

171.

Also, the failure to meet professional standards of care for these patients resulted in re-admissions of patients to hospitals and other facilities, which caused further billings to Medicaid that, but for Count V Defendants' grossly deficient, substandard or non-existent care, would not have otherwise occurred.

172.

Furthermore, the failure to report incidents of deficient care, as required by federal regulations, and the harm caused by such deficient care, allowed Count V Defendants to continue to admit patients and bill for the care of patients, despite the fact that reporting of such incidents possibly would have resulted in termination of Count V Defendants' participation in the Medicaid program.

173.

Under the terms of the Georgia False Claims Act, Count V Defendants are jointly and severally liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicaid program, as described herein, plus three (3) times the amount of damages that the State of Georgia sustained because of the acts of Count V Defendants.

## COUNT VI – GEORGIA FALSE CLAIMS ACT CLAIMS AGAINST HOSPICE PREFERRED CHOICE, INC. AND GL HOLDING DEFENDANTS

174.

Relator re-alleges and incorporates by reference paragraphs 1 through 58 and 114 through 126 as though fully set forth herein.

175.

Defendants to Count VI ("Count VI Defendants") presented, or caused to be presented, to the State of Georgia, false or fraudulent claims for payment, or made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid by the State of Georgia, as alleged herein, in violation of the Georgia False Claims Act, O.C.G.A. § 49-4-168.1.

176.

Count VI Defendants presented, or caused to be presented, claims for reimbursement of services, and received payment for hospice services provided to patients who were not eligible for hospice services. Such claims were presented to, and payments received from, the State of Georgia Medicaid program, and Count VI Defendants either knew such claims were false or fraudulent, or acted with reckless disregard or deliberate ignorance of the truth or falsity of the claims. Count VI Defendants have failed to reimburse the State of Georgia for all such payments received.

177.

Under the terms of the False Claims Act, Count VI Defendants are jointly and severally liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicaid program, as described herein, plus three

(3) times the amount of damages that the State of Georgia sustained because of the acts of Defendants.

## COUNT VII – ILLEGAL RETALIATION AGAINST GOLDEN GATE NATIONAL SENIOR CARE LLC, d/b/a GOLDEN LIVING NORTHSIDE

178.

Relator re-alleges and incorporates by reference paragraphs 1 through 138 as though fully set forth herein.

179.

From March 2009 until November 2009, Relator reported to Golden Gate National Senior Care LLC, d/b/a Golden Living Northside ("GGNSC") serious care deficiencies, cited systematic problems with the procedures established to give care to patients and increased re-admission rates for patients admitted to GLC Northside, explaining that such deficiencies resulted from the care given to patients was below the standards required by law.   The existence of such deficiencies were contrary to the certifications made by or on behalf of GGNSC in seeking payment from Medicare or Medicaid programs.  Relator's conduct was such as to indicate a "distinct possibility" that the deficiencies reported might form the basis for a false claims action, and it could be reasonably concluded that Relator was contemplating reporting the facility to the government for fraud.

85

180.

In November 2009, Relator was terminated from his position as Medical Director of Subacute Care at GLC Northside in retaliation for his continual reporting of care deficiencies.

181.

Such termination was in retaliation for Relator's protected conduct, his lawful reporting of acts and omissions on the part of GGNSC that were in furtherance of violations of the False Claims Act.

182.

Pursuant to 31 U.S.C. § 3730(h)(2), GGNSC is liable to Relator for two times the back pay, interest on said back pay and for litigation costs and attorneys fees.

## COUNT VIII – ILLEGAL RETALIATION AGAINST HOSPICE PREFERRED CHOICE, INC., GGNSC ADMINISTRATIVE SERVICES, LLC AND GOLDEN GATE NATIONAL SENIOR CARE, LLC

183.

Relator re-alleges and incorporates by reference paragraphs 1 through 138 as though fully set forth herein.

184.

From February 2005, until August 2006, Relator, from his position as
Medical Director at AseraCare Atlanta, complained that that AseraCare Atlanta
had on its census patients who did not meet Medicare criteria for hospice care and
Relator undertook efforts to remove patients from hospice care who no longer met
Medicare criteria for such care. Additionally, Relator sought to restrict new
admissions to AseraCare Atlanta to only those patients who met Medicare criteria
for hospice enrollment. Relator's conduct was such as to indicate a "distinct
possibility" that the deficiencies reported might form the basis for a false claims
action, and it could be reasonably concluded that Relator was contemplating
reporting the facility to the government for fraud.

185.

In August 2006, Relator was terminated as Medical Director of AseraCare
Hospice in retaliation for his lawful reporting of patients for whom AseraCare
Atlanta was providing hospice care, and receiving hospice care reimbursement,
despite the fact that these patients did not meet Medicare criteria for hospice care.

186.

Such termination was in retaliation for Relator's protected conduct, his

lawful reporting of acts and omissions on the part of Defendants to Count VIII that

were in furtherance of violations of the False Claims Act.

187.

Pursuant to 31 U.S.C. § 3730(h)(2), Defendants to Count VIII are liable to

Relator for two times the back pay, interest on said back pay and for litigation

costs and attorneys fees.

### COUNT IX – ILLEGAL RETALIATION AGAINST GOLDEN GATE NATIONAL SENIOR CARE LLC, d/b/a GOLDEN LIVING NORTHSIDE UNDER GEORGIA FALSE CLAIMS ACT

188.

Relator re-alleges and incorporates by reference paragraphs 1 through 138

and 179 through 181 though fully set forth herein.

189.

The termination of Relator's medical director agreements as alleged in

Count VII was in retaliation for Relator's engaging in conduct protected by the

Georgia False Claims Act, O.C.G.A. § 48-4-168, *et. seq.*

190.

Accordingly, pursuant to O.C.G.A. § 49-4-168.4, GGNSC is liable to

Relator for all relief necessary to make the employee whole and shall include two

times the amount of back pay, interest on the back pay award, and litigation costs

and reasonable attorney's fees.

## COUNT X – ILLEGAL RETALIATION AGAINST HOSPICE PREFERRED CHOICE, INC., GGNSC ADMINISTRATIVE SERVICES, LLC AND GOLDEN GATE NATIONAL SENIOR CARE, LLC UNDER GEORGIA FALSE CLAIMS ACT

191.

Relator realleges and incorporates by reference paragraphs 1 through 138

and 184 through 186 as though fully set forth herein.

192.

The termination of Relator's medical director agreement as alleged in Count

VIII were in retaliation for Relator's engaging in conduct protected by the Georgia

False Claims Act, O.C.G.A. § 48-4-168, *et. seq.*

193.

Accordingly, pursuant to O.C.G.A. § 49-4-168.4, Defendants to Count X are

liable to Relator for all relief necessary to make the employee whole and shall

include two times the amount of back pay, interest on the back pay award, and litigation costs and reasonable attorney's fees.

WHEREFORE, Plaintiff prays as follows:

(a)     That judgment be entered on Counts I through VI against the Defendants to those Counts, jointly and severally, in an amount equal to three times the actual damages;

(b)     That the Defendants to Counts I through VI be ordered to pay a civil penalty equal to between $5,500 and $11,000 for each False Claims Act violation;

(c) That the Defendants to Counts I through VI be ordered to pay costs and all expenses, including reasonable attorneys fees, for the prosecution of this action;

(d)     That for recoveries under Counts I through VI, the Relator be awarded 25% of any recovery or settlement in this action if the United States intervenes, or 30% if the United States does not intervene, and as otherwise provided by law;

(e)     That Relator recover from the Defendants named in Counts VII, VIII, IX, and X, damages in the amount of two times back pay owed him, interest on that back pay and litigation costs and attorneys fees;

(f)     For trial by jury on all Counts; and

(g)     For any and all further relief as the Court deems just and appropriate.

SIGNATURES ON NEXT PAGE

This __9th__ day of April, 2010.

Respectfully submitted,

CHILIVIS, COCHRAN, LARKINS & BEVER LLP

By:_____

Thomas D. Bever
Georgia Bar No. 055874
J.D. Dalbey
Georgia Bar No. 003150
Brian F. McEvoy
Georgia Bar No. 490845
Todd P. Swanson
Georgia Bar No. 496989

Counsel for Relator Joseph L. Micca, M.D.

3127 Maple Drive, NE
Atlanta, Georgia 303054
(404) 233-4171
(404) 261-2842 (Fax)